IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 11-20098 |
| | ) | |
| v. | ) | |
| | ) | |
| DEWAYNE GHOSTON, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AND
DENYING DEFENDANT'S MOTION TO SUPPRESS

Before the Court are the November 8, 2011 Motion to Suppress ("Motion to Suppress") and the March 13, 2012 Objections to the Magistrate Judge's Report and Recommendation filed by Defendant Dewayne Ghoston ("Ghoston"). (See ECF No. 44; see also Def.'s Objections, ECF No. 72) ("Objections").) Plaintiff the United States of America (the "Government") responded to the Objections on March 19, 2012. (See ECF No. 73.) Ghoston objects to Magistrate Judge Tu M. Pham's recommendation that the Court deny Ghoston's Motion to Suppress. (Report and Recommendation, ECF No. 65) (the "Report.").) Having reviewed Ghoston's Objections, the Court OVERRULES them and ADOPTS the Report of the Magistrate Judge. The Motion to Suppress is DENIED.

I.   Procedural and Factual Background

On Monday, March 21, 2011, Ghoston borrowed a silver Toyota Corolla (the "Corolla") from Stacey Douglas ("Douglas"), who was then Ghoston's girlfriend.[1]  (Report 2.)  Douglas had rented the Corolla earlier that weekend and had given Ghoston permission to drive it.  Ghoston was not listed as an authorized driver on the rental agreement.  (Id.)  After borrowing the Corolla, Ghoston picked up his cousin, Gregory Bratcher ("Bratcher").  (Id.) Together, they left Memphis to visit a friend in Kentucky. (Id.)

At approximately 1:05 a.m. on March 22, Agent Dustin James ("Agent James") and Trooper Jeffrey Fuller ("Trooper Fuller") were in parked police vehicles at mile-marker 25 on Interstate 40, just outside Memphis, Tennessee.  (Id. at 2-3.)  Agent James observed the Corolla traveling at a high rate of speed.  (Id. at 3.)  Readings from Agent James's radar gun indicated that the Corolla was traveling 86 miles per hour in a 65 mile per hour zone.  (Id.)  Agent James activated his emergency lights and initiated a traffic stop of the Corolla.  Ghoston pulled over to the right shoulder of Interstate 40 near mile-marker 29.  (Id.) Agent James pulled directly behind him.  Agent James noticed that the Corolla had an Illinois license plate and that there were two occupants.  (Id.)

---

[1] All facts are taken from the Magistrate Judge's Report.  Except where noted, Ghoston has not objected to the proposed factual findings.

Agent James approached the Corolla and motioned for Ghoston to step outside and move towards the back of the Corolla. (Id.) Because the traffic stop occurred on an interstate, Agent James asked Ghoston to exit the vehicle for safety reasons.[2] (Id.) Agent James informed Ghoston that he had been speeding and asked for his driver's license. (Id. at 3-4.) Ghoston complied. (Id. at 4.) Agent James asked Ghoston where he was traveling. (Id.) Ghoston said that he and Bratcher had come from Memphis and were traveling to Kentucky. (Id.)

After speaking with Ghoston, Agent James approached the front passenger's side of the Corolla and asked Bratcher for his identification. (Id.) Bratcher complied. Agent James returned to his police vehicle to run the driver's licenses through the onboard computer in his vehicle. (Id.) After two unsuccessful attempts to log onto the onboard computer, Agent James called Trooper Fuller and requested assistance. (Id.) Agent James exited his vehicle and explained to Ghoston that he could not access his computer, but that he had requested assistance from another officer. (Id. at 4-5.) Agent James estimated that only "one or two minutes" elapsed from the time he initially

---

[2] Ghoston disputes this factual finding. He testified that he remained in the Corolla while Agent James checked his and Bratcher's driver's licenses. Ghoston claims that approximately twelve to fifteen minutes elapsed while Agent James checked the licenses. Ghoston bases this approximation on the number of songs played on the radio while he waited.

3

attempted to access his onboard computer until he called Trooper
Fuller for assistance.[3] (Id. at 5.)

Trooper Fuller arrived approximately three to four minutes
after receiving Agent James's call. (Id.) Agent James gave
Trooper Fuller the driver's licenses. (Id.) Trooper Fuller
returned to his vehicle and checked the driver's licenses using
his onboard computer. (Id.) He validated the licenses and
checked for outstanding warrants and criminal history. (Id.)
Trooper Fuller spent approximately ten to fifteen minutes
searching Ghoston and Bratcher's backgrounds. (Id.) Trooper
Fuller testified that he could check driver's licenses as
quickly as a remotely located dispatcher. (Id.)

While Trooper Fuller checked licenses, Agent James asked
Bratcher, who was sitting in the front passenger's seat, about
his travel plans.[4] (Id.) Bratcher responded that he and Ghoston
were headed to Jackson, Tennessee. (Id.) Agent James noted an
inconsistency between Bratcher and Ghoston's accounts. (Id.)
Agent James asked whether there were any narcotics or firearms
in the vehicle. (Id. at 5-6.) Bratcher admitted that there was
a marijuana cigarette in the center console, which he removed
and handed to Agent James. (Id. at 6.) Agent James then
approached Ghoston and, without telling him about the discovery

---

[3] Ghoston objects to this finding of fact.
[4] Ghoston objects to this finding of fact.

of the marijuana cigarette, asked whether there were any narcotics or firearms in the car. (Id.) Ghoston admitted that there was an unloaded, "broken down" shotgun in the trunk. (Id.)

Agent James called for additional assistance. (Id.) Within a few minutes, Agents David Lytal ("Agent Lytal") and Johnny Carter ("Agent Carter") arrived on the scene. (Id.) Trooper Fuller completed his driver's license check around the time that Agents Carter and Lytal arrived.[5] (Id.) Trooper Fuller reported to Agent James that the licenses were valid, but that Ghoston and Bratcher might have prior felony convictions. (Id. at 6-7.) The officers placed Ghoston and Bratcher in separate squad cars and searched the Corolla. (Id. at 7.) In the trunk, officers found a black duffel bag that contained a sawed-off shotgun, shotgun shells, duct tape, a box of latex gloves, a black bandana, and a BB gun. (Id.)

Agent James contacted the Fayette County Sheriff's Office to perform a full criminal history check. (Id.) The dispatcher confirmed that both men had prior felony convictions. (Id.) Ghoston and Bratcher were placed under arrest and taken in for booking and processing. (Id.) The officers had the Corolla towed from the scene. (Id.) At the Task Force office, Ghoston and Bratcher were placed in separate interview rooms. (Id.)

---

[5] Ghoston objects to this fact.

Both were advised of their <u>Miranda</u> rights, waived them, and agreed to answer the officers' questions. (<u>Id.</u>) Ghoston claimed ownership of the shotgun and said that he kept it for protection. (<u>Id.</u>) Ghoston and Bratcher were subsequently indicted for being convicted felons in possession of a firearm, in violation of 18 U.S.C. § 922(g). (<u>Id.</u>)

## II.  Standard of Review

"A district judge must determine <u>de novo</u> any part of a magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b); 28 U.S.C. § 636(b)(1)(C). After reviewing the evidence, the court is free to accept, reject, or modify the proposed findings or recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(C). The district court is not required to review—under a <u>de novo</u> or any other standard—those aspects of the report and recommendation to which no objection is made. <u>Thomas v. Arn</u>, 474 U.S. 140, 150 (1985). The district court should adopt the findings and rulings of the magistrate judge to which no specific objection is filed. <u>Id.</u> at 151.

## III. Analysis

### A. Findings of Fact

Ghoston objects generally to what he characterizes as the Magistrate Judge's "cursory determinations of witnesses." (Objections 2.) According to Ghoston, the Magistrate Judge did

6

not provide specific reasons why the law enforcement officers' testimony should be credited over the testimony of Ghoston and Bratcher.

Ghoston also objects to specific findings of fact. He objects to the Magistrate Judge's findings that: (1) after stopping the vehicle, Agent James asked Ghoston to step outside and come toward the back of the car and that Ghoston complied; (2) Trooper Fuller spent approximately ten to fifteen minutes checking Ghoston and Bratcher's licenses; (3) Agent James questioned Bratcher while Trooper Fuller checked the licenses; 4) Agent James did not tell Ghoston about discovering marijuana before he asked whether there were firearms in the Corolla; and (5) Agents Lytal and Carter arrived on the scene at the same that Trooper Fuller completed the driver's license check.

## 1. Initial Credibility Determination

Ghoston objects to "the Magistrate Court's cursory determination regarding the credibility of witnesses." (Objections 2.) He contends that the Magistrate Judge did not provide specific reasons for crediting the officers' testimony. Ghoston argues that "there was nothing about the demeanor exhibited by either [Ghoston or Bratcher] during their testimony to support the Magistrate Court's determination that certain parts of their testimony was not credible." (Id.) Ghoston

submits that there were no inconsistencies that cast Ghoston and Bratcher's testimony into doubt. (Id.)

The Court is "'statutorily and constitutionally required' to engage in a de novo review" of the credibility of witnesses. United States v. Hampton, No. 2:08-cr-20280, 2011 U.S. Dist. LEXIS 125374, at *18 (W.D. Tenn. Oct. 28, 2011) (quoting United States v. Burcham, 388 F. App'x 478, 481 (6th 2010)). Although the standard is de novo, courts in the Sixth Circuit are "generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness and assess his demeanor." Peveler v. United States, 269 F.3d 693, 702 (6th Cir. 2001) (citing Ramsey v. United Mine Workers of Am., 481 F.2d 742, 747 (6th Cir. 1973)). So long as the court is in the best position to assess a witness's credibility, courts give deference to the trier of fact. See United States v. Hill, 195 F.3d 258, 264-65 (6th Cir. 1999).

Ghoston argues that the Magistrate Judge's "cursory determination" about credibility was not supported by the facts. Ghoston contends that consistencies between his and Bratcher's testimony suggest that they, not law enforcement, were credible.

As the trier of fact, the Magistrate Judge was in the best position to evaluate all witnesses' credibility. See United States v. Freeman, 412 F. App'x 735, 743 (6th Cir. 2010). The Magistrate Judge enjoyed the benefit of first-hand observation

8

that a stale record cannot re-create. The Magistrate Judge
observed the demeanor of each witness and weighed the
differences between their testimony. After weighing the
evidence before him, the Magistrate Judge concluded, and the
Court agrees, that the Government's witnesses were credible.
The record provides "no compelling reason to second-guess the
magistrate judge's decision." Peveler, 269 269 F.3d at 702; see
also Freeman, 412 F. App'x at 743.

## 2. Ghoston's Placement at the Vehicle

Ghoston objects to the Magistrate Judge's crediting
testimony that Agent James asked Ghoston to exit the Corolla
immediately after the traffic stop and that Ghoston complied.
(Objection 2.) Agent James testified that he asked Ghoston to
exit his vehicle and accompany him to the rear of the Corolla.
(See Jan. Hr'g Tr. 10:9-12, ECF No. 63) ("Jan. Hr'g Tr.") Agent
James testified that he made the request as a safety precaution.
(Id. 11:10-17.) Ghoston and Bratcher's testimony contradicts
Agent James's account. Ghoston submits that Agent James did not
ask him to exit the Corolla until after Agent James was unable
to access the onboard computer. (Id. 162:1-7, 196: 7-16.)

The Magistrate Judge concluded, and the Court agrees, that
Agent James asked Ghoston to exit the Corolla immediately after
initiating the traffic stop. Interstate 40 is a high-volume
thoroughfare. Vehicles travel at high rates of speed no matter

what time of day. Agent James asked Ghoston to exit the Corolla to minimize the dangers associated with executing a traffic stop on a crowded interstate at night. The request was reasonable, given the circumstances. "Officer safety, especially during traffic stops, is a legitimate and weighty justification that is too plain for argument." United States v. Alexander, Nos. 09-5518, 09-5894, 2012 U.S. App. LEXIS 537, at *20 n.7 (6th Cir. Jan. 10, 2012) (internal quotation marks and citation omitted). Concern for officer safety "permits a variety of responses in differing circumstances, including ordering a driver and passenger out of a car during a traffic stop." United States v. Moore, 390 F. App'x 503, 506 (6th Cir. 2010).

Ghoston does not object to the Magistrate Judge's finding that Agent James asked Ghoston to exit the vehicle as a safety precaution. Given that uncontroverted fact, the countervailing account is less plausible. The request to Ghoston after stopping him is consistent with a concern for officer safety. The Court finds nothing in the record "that merits setting that determination aside." United States v. Belcher, No. 11-17-GFVT, 2011 U.S. Dist. LEXIS 83173, at *5 (E.D. Ky. July 28, 2011). Agent James's testimony is credible.

### 3. Time Running Licenses

Ghoston objects to the Magistrate Judge's finding that Agent James took only "one or two minutes" to run a license

check. (Objections 2-3.) Ghoston contends that Agent James took ten to fifteen minutes checking licenses. (Id. at 3.) As evidence, Ghoston points to his memory of listening to several songs on the radio while he waited in the Corolla. (Id.) Ghoston argues that Bratcher's testimony corroborates his account. Bratcher estimated that Agent James took approximately five to ten minutes to check their licenses.

Bratcher's estimate does not corroborate Ghoston. Bratcher testified that he waited approximately five to ten minutes. Ghoston testified that they waited between ten or twelve to fifteen minutes.[6] There are discrepancies in the estimates. Given those discrepancies, the Magistrate Judge's conclusion is reasonable. Failing to access an onboard computer and subsequently requesting assistance is not time-intensive. Agent James did not state that he logged in, attempted to search the database, and was unsuccessful. Instead, Agent James testified that he attempted to access his onboard computer, failed, and immediately requested assistance. His account is consistent with an expeditious time frame. The Magistrate Judge correctly concluded that Agent James was credible.

---

[6] It is unclear from the transcripts whether Ghoston says that he waited twelve to fifteen minutes, or ten to fifteen minutes. When initially asked how long Agent James spent checking his license, Ghoston answered "Anywhere from 12 minutes – 12 –12 to fifteen minutes." (Jan H'rg Tr. 160:11-12.) He then said that the time was "somewhere in there." (Id. at 160:14.) Ghoston's attorney then asked, "I'm sorry. 10 to 15 minutes?" Ghoston nodded his head affirmatively. (Id. at 160:16.)

Ghoston also objects to the proposed finding that it took Trooper Fuller approximately ten to fifteen minutes to check the driver's licenses. (Objections 4.) Ghoston testified that it took only three to five minutes. (Id.) The Magistrate Judge credited Trooper Fuller. Ghoston contends that the Magistrate Judge erred.

Trooper Fuller testified that he spent approximately ten to fifteen minutes conducting background checks. Bratcher's testimony corroborates Trooper Fuller. (Jan. Hr'g Tr. 85:15-20.) At the Suppression Hearing, Bratcher testified that Trooper Fuller "probably took another 10 minutes to come back." (Id. 199:7-8.) Ghoston claimed that Trooper Fuller spent "three to five" minutes checking the licenses. (See id. 184:15.) Given the disparity between Bratcher and Ghoston's accounts, the Magistrate Judge reasonably concluded that Trooper Fuller's testimony was more credible.

### 4. The Timing of Questioning

Ghoston objects to the Magistrate Judge's finding that Agent James questioned Bratcher while Trooper Fuller checked the licenses. (Objections 5.) Ghoston argues that the Magistrate Judge "erred in summarily discrediting his version of events that Trooper Fuller had returned his license to Agent James (and notified James that his license was valid) before Agent James started questioning Bratcher." (Id.)

Trooper Fuller testified that, "I remember while I was sitting in my patrol car, [Agent James] came back there, I believe, and told me that one of the guys had just handed him a – a marijuana joint from the vehicle." (Jan. Hr'g Tr. 87:4-10.) Agent James testified that he talked to Bratcher while Trooper Fuller conducted the license check and that his discussion uncovered marijuana in the vehicle. (See id. 42:1-6; 46:3-15.) These accounts are consistent. The "consistency of two officers' accounts" indicates that their statements are credible. See United States v. Garrido, 467 F.3d 971, 979 (6th Cir. 2006); see also United States v. Woodruff, No. 09-20153, 2011 U.S. Dist. LEXIS 133266, at *14-15 (W.D. Tenn. Nov. 17, 2011).

### 5. The Marijuana Discovery

Ghoston objects to the Magistrate Judge's finding that Agent James did not disclose the discovery of marijuana to him before asking whether there were any narcotics or firearms in the Corolla. (Id.) Specifically, Ghoston objects to the Magistrate Judge's decision to credit Agent James's testimony over his and Bratcher's. Ghoston contends that his version of events "simply makes more sense." (Id.) It "strains credulity," Ghoston argues, "to believe that a trained officer, who has just discovered illegal contraband in a vehicle, would not have advised the driver of the car of his discovery before

13

asking the driver whether there were any drugs or guns in the car." (Id.)

Bratcher told Agent James that there was marijuana in the Corolla. (See Jan. Hr'g Tr. 45:19-24.) Holding the marijuana but concealing its nature, Agent James testified that he then asked Ghoston whether there were any illegal weapons or narcotics in the vehicle. (Id. 49:5-19.) Ghoston's statement does not contradict Agent James's account. Ghoston claims that that Agent James, after coming from the vehicle and questioning Bratcher about the marijuana, asked if there were narcotics or firearms in the Corolla. (Id. 185:16-20.) Ghoston does not specify when Agent James informed him that there was marijuana in the Corolla. Agent James was the only witness who provided a detailed account of the marijuana discovery. The Magistrate Judge was correct to credit Agent James's testimony.

### 6. The Arrival of Agents Lytal and Carter

Ghoston objects to the Magistrate Judge's finding that Agents Lytal and Carter arrived on the scene as Trooper Fuller completed the license check. (Id.) Ghoston contends that Trooper Fuller had completed his license check and had returned the licenses to Agent James before Agents Lytal and Carter arrived. (Id.)

Trooper Fuller testified that Agents Lytal and Carter arrived "just shortly after" he had completed a search of the

driver's licenses. (See Jan. Hr'g Tr. 87:15-17.) Trooper
Fuller did not explain how "shortly after" the Agents arrived.
Agent James did not state when Agents Lytal and Carter arrived.
Agent Lytal testified that Trooper Fuller was "in his vehicle"
when Agents Lytal and Carter arrived on the scene. (Id. at
114:24-25.) There is no indication of when the licenses were
returned.

The Magistrate Judge correctly concluded that Agents Lytal
and Carter arrived as Trooper Fuller finished the license check.
Agents Lytal and Carter claim that Trooper Fuller was in his
vehicle when they arrived. Trooper Fuller claims that he had
just finished his license check, but he does not say that he had
returned the licenses. Because Agents Lytal and Carter arrived
"just shortly after" Trooper finished his license checks, but
while Trooper Fuller was in his police vehicle, it was
reasonable for the Magistrate Judge to conclude that Agents
Carter and Lytal arrived while Trooper Fuller was checking the
licenses.

### B. Conclusions of Law

Ghoston objects to two of the Magistrate Judge's legal
conclusions. First, Ghoston objects under Terry v. Ohio, 392
U.S. 1 (1968). He argues that Agent's James's investigative
methods were not the "least intrusive means available to verify
or dispel his suspicion" because a routine traffic stop for a

speeding violation was transformed into an extensive search of Ghoston and Bratcher.  See United States v. Everett, 601 F.3d 484, 488-89 (6th Cir. 2010)).  Second, Ghoston argues that Agent James detained them longer than reasonably necessary to issue the traffic citation because Agent James did not have reasonable suspicion of "more extensive criminal conduct."  See United States v. Townshend, 305 F.3d 537, 541 (6th Cir. 2002).

## 1. Agent James's Investigative Methods Were the Least Intrusive Means Available

The Magistrate Judge concluded, and the Court agrees, that the scope and duration of the traffic stop were reasonably limited to the purpose of the stop.  (See Report 11.)  Under Terry, "a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intensity and scope."  Terry, 392 U.S. at 18; see also Florida v. Royer, 460 U.S. 491, 500 (1983).  In this Circuit:

> [t]o qualify as reasonable seizures under the Fourth Amendment, Terry detentions must be limited in both scope and duration.  Under Terry's duration prong, a stop must last no longer than is necessary to effectuate the purpose of the stop.  Under its scope prong, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.

Everett, 601 F.3d at 488-89 (internal citations and quotation marks omitted).

16

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). A seizure that is initially lawful may violate the Fourth Amendment if "its manner of execution unreasonably infringes interests protected by the Constitution." Illinois v. Caballes, 543 U.S. 405, 407 (2005). A law enforcement officer does not violate the Fourth Amendment "merely by asking a detained motorist extraneous questions so long as those questions do not unnecessarily prolong the detention, and the detainees' responses are voluntary and not coerced." United States v. Aguilera-Pena, 426 F. App'x 368, 370 (6th Cir. 2011) (citing Everett, 601 F.3d at 496). Reasonable suspicion that an individual has engaged in more extensive criminal conduct permits law enforcement to detain a motorist "longer than is reasonably necessary to issue the traffic citation." See id.

Ghoston argues that Agent James's investigative methods were not the "least intrusive means reasonably available to verify or dispel his suspicion in a short period of time." (Objections 6.) Ghoston contends that Trooper Fuller's performing the background checks was not the least intrusive means. Ghoston asserts that Agent James could have called the Fayette County dispatcher to run the license checks, which would have produced the same information quicker.

The Magistrate Judge concluded, and the Court agrees, that the scope and duration of the traffic stop were reasonably limited to the purpose of the stop. Agent James stopped the Corolla because it was speeding. After stopping the Corolla, Agent James asked Ghoston to exit the vehicle to minimize the danger of conducting a traffic stop on a busy interstate. When a motor vehicle has been lawfully detained for a traffic violation, "the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Arizona v. Johnson, 555 U.S. 323, 331 (2009) (citing Pennsylvania v. Mimms, 434 U.S. 106 (1977)).

Agent James did not exceed the scope of the detention by checking the licenses for outstanding warrants. "In a traffic stop, an officer can lawfully detain the driver of a vehicle until after the officer has finished making radio record checks and issuing a citation, because this activity would be well within the bounds of the initial stop." United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009) (quoting United States v. Wellman, 185 F.3d 651, 656 (6th Cir. 1999)). It was also reasonable for Agent James to question Ghoston and Bratcher about their travel plans. "It is well established that an officer is free to ask traffic-related questions, and questions about a driver's identity, business and his travel plans during

the course of a travel stop." <u>United States v. Ellis</u>, 497 F.3d
606, 613-14 (6th Cir. 2007); <u>see also</u> <u>United States v. Potts</u>,
No. 97-6000, 1999 U.S. App. LEXIS 1625, at *4 (6th Cir. Oct. 4,
1999).

Agent James testified that it took him only one or two
minutes to realize that his on-board computer did not work. He
also testified that only a few minutes elapsed between his
request for assistance from Trooper Fuller and the background
checks. There is no Fourth Amendment violation when law
enforcement officers ask motorists questions while conducting
background searches if there is "no evidence that [the
discussions] extended the time required" to conduct a search.
<u>Bell</u>, 555 F.3d at 542-43; <u>see also</u> <u>Everett</u>, 601 F.3d at 492. So
long as the questions do not extend the time of the stop, "an
officer may ask unrelated questions to his heart's content,
provided he does so during the supposedly dead time while he or
another officer is completing a task related to the traffic
violation." <u>Everett</u>, 601 F.3d at 492. Agent James asked
questions while Trooper Fuller verified the licenses and
conducted background checks. This was reasonable under <u>Everett</u>.

### 2. The Length of Detention Was Reasonably Necessary

Ghoston argues that Agent James detained Ghoston and
Bratcher longer than reasonably necessary to issue the traffic
citation. Ghoston claims that Agent James admitted he lacked

reasonable suspicion that Ghoston or Bratcher had committed illegal acts other than the traffic violation. According to Ghoston, because Agent James lacked reasonable suspicion before he asked Bratcher if there were drugs or weapons in the Corolla, the fruits of the traffic stop should be suppressed. Ghoston relies on United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002), where the court concluded that, "to detain a motorist any longer than [] reasonably necessary to issue the traffic citation, . . . the officer must have reasonable suspicion that the individual has engaged in more extensive criminal conduct."

Ghoston's reliance on Townsend is misplaced. Townsend affirmed a district court's determination that officers lacked reasonable suspicion based on a number of facts not present in the instant case. See Townsend, 305 F.3d at 543-545. Townsend does not prohibit an officer from asking routine investigative questions during the "dead period" while another officer is checking licenses. See Everett, 601 F.3d at 492. One of the questions asked during this "dead period" was whether there were dangerous weapons in the Corolla. Officer safety during traffic stops is a "weighty interest," and there is "widespread agreement . . . that officers conducting a traffic stop may inquire about dangerous weapons." Id. at 495. Agent James and Trooper Fuller had reasonable suspicion to search the vehicle because Ghoston admitted that there was a shotgun in the trunk.

Agent James's inquiry about drugs was also permissible. He "asked only a single question before [Ghoston] confessed to possessing [marijuana], giving [Agent James] probable cause to arrest him and search the car." Id. The length of detention was reasonably necessary.

Ghoston argues that officers did not inquire about or locate contraband in the Corolla until after Trooper Fuller had returned the licenses. Under Ghoston's theory, the traffic stop concluded then. Agent James's questioning about contraband would begin a new phase of the investigation. Ghoston argues that all the contraband seized from the new investigation should be suppressed as "fruit of the poisonous tree." See Wong Sun v. United States, 371 U.S. 471 (1963).

Ghoston's argument depends on the timing of Agent James's questioning. The Magistrate Judge concluded, and the Court has agreed, that the questioning occurred while Trooper Fuller conducted the license checks. Asking routine investigative questions is permissible while license checks are being conducted by another officer. See Everett, 601 F.3d at 492. The answers to these investigative questions provided reasonable suspicion to prolong the traffic stop and probable cause to search the Corolla. The officers' execution of the traffic stop and the search of the Corolla were reasonable.

**IV. Conclusion**

21

The Court OVERRULES Ghoston's objections and ADOPTS the Report and Recommendation of the Magistrate Judge. Defendant's Motion to Suppress is DENIED.

So ordered this 20th day of April, 2012.

s/ Samuel H. Mays, Jr._____
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE